UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
JOSEPH URENA,                           :
                                        :
        Plaintiff,                      :  CASE NO.: _____
                                        :
   -against-                           :  **COMPLAINT**
                                        :
THE MEDICINES COMPANY, MARK             :  **DEMAND FOR JURY TRIAL**
TIMNEY, CHRIS VISIOLI, ALEXANDER J.     :
DENNER, GENO J. GERMANO, JOHN C.        :
KELLY, CLIVE MEANWELL, PARIS            :
PANAYIOTOPOULOUS, and SARAH J.          :
SCHLESINGER,                            :
                                        :
        Defendants.                     :
--------------------------------------- X

Plaintiff Joseph Urena ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.    This is an action brought by Plaintiff against The Medicines Company ("Med Co" or the "Company") and the members of the Company's executive officers and board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Med Co, the "Defendants") for their violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9"). Plaintiff's claims arise in connection with the proposed tender offer by Novartis International AG ("Novartis" or "Parent") through Medusa Merger Corporation, ("Purchaser"), an indirect wholly-owned subsidiary of Parent, to acquire all of the issued and outstanding shares of

1

the Company (the "Tender Offer").

2. On November 23, 2019, Med Co entered into an Agreement and Plan of Merger (the "Merger Agreement") by and among the Company, Parent, and Purchaser, pursuant to which Purchaser will merge with and into the Company, with the Company surviving the merger as an indirect wholly-owned subsidiary of the Parent (the "Proposed Transaction").

3. Under the terms of the Merger Agreement, each stockholder of Med Co common stock will be entitled to receive $85.00 in cash per share of common stock (the "Offer Price").

4. On December 5, 2019, in order to convince Med Co's public common stockholders to tender their shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the SEC.

5. In particular, the Recommendation Statement contains materially incomplete and misleading information concerning: (i) the financial projections for Med Co; and (ii) the valuation analyses performed by Med Co's financial advisors, Goldman Sachs & Co. LLC ("Goldman Sachs") and J.P. Morgan Securities LLC ("J.P. Morgan" and together the "Financial Advisors") in support of their fairness opinions.

6. The Tender Offer is scheduled to expire at Midnight, New York Time, on January 3, 2020 (the "Expiration Time"). It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's stockholders prior to the Expiration Time so they can properly determine whether to tender their shares.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule 14d-9. Plaintiff seeks to enjoin Defendants from closing the Tender Offer or taking any steps to

consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Med Co's public common stockholders sufficiently in advance of the Expiration Time or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule 14d-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Company's Financial Advisors are headquartered in this District, as is Paul, Weiss, Rifkind, Wharton & Garrison LLP, the Company's legal counsel for the Proposed Transaction. Moreover, the Company's common stock trades on the Nasdaq, which

3

is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Med Co common stock.

12. Defendant The Medicines Company is a Delaware corporation with its principal place of business located at 8 Sylvan Way Parsippany, New Jersey 07054. It is a biopharmaceutical company which focuses on developing therapeutics for the treatment of cardiovascular disease. The company is developing Inclisiran, a small interfering RNA (siRNA) therapy being studied to evaluate its ability to lower low-density lipoprotein (LDL) cholesterol ("LDL-C" or "Bad Cholesterol"). Med Co's common stock trades on the Nasdaq under the ticker symbol "MDCO."

13. Defendant Mark Timney is, and has been at all relevant times, Chief Executive Officer and a director of the Company.

14. Defendant Chris Visioli is, and has been at all relevant times, Chief Finance Officer of the Company.

15. Defendant Alexander J. Denner is, and has been at all relevant times, the Company's Chair of the Board of Directors, Chair of the Nominating and Corporate Governance Committee, and a member of the Compensation Committee and the Audit Committee.

16. Defendant Geno J. Germano is, and has been at all relevant times, an independent director of the Company.

17. Defendant John C. Kelly is, and has been at all relevant times, Chair of the Audit Committee and an independent director of the Company.

4

18. Defendant Clive Meanwell, is, and has been at all relevant times, Chief Innovation Officer of the Company.

19. Defendant Paris Panayiotopoulous is, and has been at all relevant times, the Company's Chair of the Compensation Committee, a member of the Nominating and Corporate Governance Committee, and an independent director.

20. Defendant Sarah J. Schlesinger is, and has been at all relevant times, a member of the Compensation Committee, a member of the Audit Committee, and an independent director.

21. The defendants identified in paragraphs 13 through 20 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Med Co, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I. Background and the Unfair Offer Price

22. The Individual Defendants and Financial Advisors stand to gain tremendously from the consummation of the Proposed Transaction at the expense of the Company's shareholders. The Proposed Transaction comes at a time when the Company is set to capitalize on years of investment and research into the drug Inclisiran. The Proposed Transaction will cash out Med Co's shareholders at a price that fails to adequately compensate them for the intrinsic value of their shares and instead provides unique benefits to the Individual Defendants and Financial Advisors, as they stand to gain millions, if not hundreds of millions of dollars in cash consideration for the merger. *See* Recommendation Statement at 7-8, 43-44, 47.

23. That the consideration is inadequate can be evinced through analysis of the Company's historical financial data and the resulting increases to its stock price following the results of recent clinical trials. In the past year alone, Med Co has experienced tremendous

financial growth and success. As stated in their Second-Quarter 2019 Financial Results:

> "Exceptional execution places us in a strong position for shareholder value creation as we move toward imminent Phase 3 data readouts in advance of anticipated regulatory filings," said Mark Timney, Chief Executive Officer of The Medicines Company. "We believe that inclisiran has the potential to revolutionize the treatment of cardiovascular disease by delivering a twice-a-year therapy with potent and durable LDL cholesterol lowering that addresses the widespread need for additional LDL-C reduction and the currently intractable medication adherence challenges faced by millions of people.

24.     As stated above, the Company's current financial success can be largely attributed to the positive outcomes for clinical trials of the drug Inclisiran. Inclisiran is a drug which shows persistent lowering of Bad Cholesterol (over 50% lower), which has enormous potential to revolutionize preventative medicine for cardiovascular diseases. As a result, the success of the clinical trials on Inclisiran has had a corresponding positive impact on the stock price.

25.     For example, on Friday, August 23, 2019, Med Co stock closed at $35.03. On Monday, August 26, 2019, Med Co announced positive topline results from their Phase 3 trial of Inclisiran. Within one trading week from the announcement, on Monday, September 3, 2019, Med Co stock closed at $46.31, reflecting a 32.2% increase to the stock price. Furthermore, on November 18, 2019, the Company again announced positive results of a different Phase 3 trial of Inclisiran. On that day, the stock opened at $52.25 and closed at $58.65, representing a drastic same day increase in the stock price of 12.2%. Thus, the stock price was trending upward at a breakneck pace.

26.     Unfortunately, stockholders will never be able to see the intrinsic value of their shares reflected on the market. As the day following the November 18, 2019 stock jump, Bloomberg published an article stating that merger negotiations were ongoing. Following the article, it becomes impossible to attribute the rising stock price to one sole reason, as it could be

due to either the clinical trial results or the rumors of a merger or both. Thus, despite Med Co's intrinsic value and exceptional growth prospects, the Individual Defendants are agreeing to sell the Company and deprive its stockholders of the ability to partake in the Company's future growth. The Individual Defendants breached their fiduciary duties owed to the Company's shareholders by agreeing to the Proposed Transaction at an unfair Offer Price.

II.     **The Proposed Transaction**

27.     On November 24, 2019, Med Co and Novartis jointly announced the Proposed Transaction. The press release stated as follows:

> **The Medicines Company Enters Into Definitive Agreement to be Acquired by Novartis AG for $9.7 billion**
>
> PARSIPPANY, N.J., November 24, 2019 – The Medicines Company (NASDAQ: MDCO) announced today that it has entered into definitive agreement in which Novartis AG will acquire The Medicines Company for $85 per share in an all-cash transaction, implying a fully diluted equity value of $9.7 billion. The price represents a premium of approximately 45% to The Medicines Company's closing share price of $58.65 on November 18, 2019 (the last trading day prior to news reports of a potential transaction between The Medicines Company and Novartis AG). The transaction was unanimously approved by the Boards of Directors of both companies.
>
> "Our company's singular, relentless focus and the unwavering commitment of our employees have led to this opportunity to unlock the intrinsic value of inclisiran for patients and to maximize value for our shareholders," said Mark Timney, Chief Executive Officer of The Medicines Company. "We are excited that millions of patients with atherosclerotic cardiovascular disease and familial hypercholesterolemia will potentially benefit from this transformational therapy."
>
> Alexander J. Denner, Ph.D., Chairman of The Medicines Company Board of Directors, said: "This $9.7 billion transaction is a great outcome for shareholders of The Medicines Company. Not so long ago, The Medicines Company was at a crossroads due to the loss of its key revenue driver. I am proud of the company's transformation under a reconstituted board into a lean, highly focused team successfully advancing an exciting new therapy and creating tremendous value for patients and shareholders."
>
> "We recognized the innovative promise of inclisiran and focused the

7

company's resources to advance it from early development through phase 3 in 'record' time for the benefit of patients. Inclisiran has the potential to revolutionize the treatment of cardiovascular disease and profoundly improve the lives of millions of people around the world."

Dr. Denner continued, "Our vision for inclisiran is an affordable, widely available treatment that will dramatically reduce both the medical and economic burden of cardiovascular disease. Given the enormous capital required to realize its full potential, we have decided to sell to a company with resources and scale in excess of ours."

"On behalf of the board, I thank our outstanding management team and talented employees for their tireless work and dedication. I would also like to thank our partner Alnylam whose gracious support was invaluable in consummating this transaction."

Completion of the transaction is expected in first quarter of 2020, pending the successful completion of the tender offer and other customary closing conditions. Until that time, The Medicines Company will continue to operate as a separate and independent company. The company expects to file regulatory submissions for inclisiran in the U.S. in the fourth quarter of 2019 and in Europe in the first quarter of 2020.

Goldman Sachs & Co. LLC and J.P. Morgan Securities LLC are acting as financial advisors to The Medicines Company, and Paul, Weiss, Rifkind, Wharton & Garrison LLP is acting as legal counsel for The Medicines Company.

**Transaction Details**
Under the terms of the merger agreement, Novartis AG will commence a tender offer to purchase all outstanding shares of The Medicines Company for $85 per share in cash. Following the completion of the tender offer, a wholly owned subsidiary of Novartis AG will merge with The Medicines Company and shares of The Medicines Company that have not been tendered and purchased in the tender offer will be converted into the right to receive the same price per share in cash as paid in the tender offer (other than shares held by stockholders who properly demand and perfect appraisal rights under Delaware law). The tender offer and the merger are subject to customary closing conditions, including the tender of at least a majority of outstanding shares of The Medicines Company and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act. The tender offer and the merger are not subject to a financing condition.

**About The Medicines Company**
The Medicines Company (NASDAQ: MDCO) is a biopharmaceutical

company with a singular, relentless focus on addressing the greatest global healthcare challenge and burden today – cardiovascular disease. Our purpose is to halt the deadly progression of atherosclerosis and the cardiovascular risk created by high levels of LDL-C, or bad cholesterol. The Company is headquartered in Parsippany, New Jersey. For more information, please visit www.themedicinescompany.com and follow us on Twitter @MDCONews and LinkedIn.

28. Rather than continuing to build upon Med Co's improving prospects, the Offer Price presented to Med Co's shareholders is unfair and grossly inadequate because, among other things, the intrinsic value of Med Co's common stock is materially in excess of the amount offered given the Company's recent financial performance, its positive clinical trials, and its prospects for future growth and earnings.

### III. The Recommendation Statement Omits Certain Material Information

29. On September 11, 2019, Defendants filed a materially incomplete and misleading Recommendation Statement with the SEC. The Individual Defendants were obligated to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Recommendation Statement misrepresents or omits material information that is necessary for Med Co's public common stockholders to make an informed decision concerning whether to tender their shares, in violation of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule 14d-9.

30. First, the Recommendation Statement fails to fully disclose Med Co's financial projections. Specifically, the Recommendation Statement fails to disclose the unlevered free cash flows calculated by J.P. Morgan and utilized in its *Discounted Cash Flow Analysis.* The Recommendation Statement also provides non-GAAP (generally accepted accounting principles) financial metrics for Med Co—EBITDA—but fails to disclose the line-item projections for the

specific metrics, adjustments, and/or inputs that are used to calculate the Non-GAAP financial measures. *See* Recommendation Statement at 36.

31. While reporting projections of EBITDA, the Recommendation Statement fails to disclose Med Co's projected: (i) earnings; (ii) interest; (iii) taxes; (iv) depreciation; and (v) amortization and stock-based compensation. *Id.* The failure to disclose the line-item projections that compose Med Co's EBITDA renders the Recommendation Statement materially incomplete and misleading because non-GAAP numbers are inherently misleading. Contrary to GAAP metrics, non-GAAP figures are not standardized and, consequently, can be manipulated and easily taken out of context. Because non-GAAP measures, such as EBITDA, can be measured in different ways, it is inherently misleading when it is not taken in context with GAAP figures or reconciled alongside its line-items inputs. Indeed, the Recommendation Statement itself concedes that non-GAAP metrics are inherently misleading for this exact reason:

> **Non-GAAP financial measures should not be considered as an alternative to operating income or net income as measures of operating performance, or as an alternative to cash flows as a measure of liquidity**. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by the Company may not be comparable to similarly titled amounts used by other companies. No reconciliation of non-GAAP measures in the Management Projections to GAAP measures was created or used in connection with the Transactions.

*Id.* at 37.

32. While the Recommendation Statement discloses the unlevered free cash flows projected by management, it fails to disclose the unlevered free cash flows calculated by J.P. Morgan. With respect to J.P. Morgan's financial projections, the Recommendation Statement discloses that when preparing its *Discounted Cash Flow Analysis*, "J.P. Morgan calculated the unlevered free cash flows that the Company is expected to generate during fiscal years 2019

through 2040 based upon financial projections prepared by the management of the Company through the years ended 2040." *Id.* at 46. Compare this to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*, which used "the Company management's estimates of the unlevered free cash flows." *Id.* at 41. One of the most seminal texts to ever be written on securities, states that as to free cash flows:

> Investors today analyze free cash flow. This is the cash generated annually from the operations of a business after all capital expenditures are made and changes in working capital are considered. Investors have increasingly turned to [free cash flows] because reported earnings can be an accounting fiction, masking the cash generated by a business or implying positive cash generation when there is none. Today's investors have rightly concluded that following the cash—as the manager of a business must do—is the most reliable and revealing means of assessing a company.

Benjamin Graham & David L. Dodd, *Securities Analysis* 6th Edition, xxx (2008).

33. The absence of unlevered free cash flow projections, GAAP metrics, and line-item projections composing EBITDA within the Proxy, but the inclusion of other projections, renders statements made as to all financial projections misleading to shareholders. "Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up." See *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1125 (8th Cir. 2019) (citing *Mendell v. Greenberg*, 927 F.2d 667, 670 (2d Cir. 1990)). In this case, only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate. This must be the case as financial projections may easily be manipulated in order to fit a narrative. Consequently, regarding future events, uncertain figures, and other "soft" information, a company may choose either to remain silent or speak with full and comprehensive veracity—but it may not provide half-truths.

34. Second, the Recommendation Statement describes Goldman Sachs' and J.P.

Morgan's fairness opinions and the various valuation analyses performed in support of their respective opinions. However, the description of Goldman Sachs' and J.P. Morgan's fairness opinions and analyses fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Med Co's stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, *if any*, to place on Goldman Sachs' and J.P. Morgan's fairness opinions in determining whether to tender their shares in the Tender Offer. This omitted information, if disclosed, would significantly alter the total mix of information available to Med Co's common stockholders.

35. With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis*, the Recommendation Statement must disclose: (i) the inputs and assumptions underlying the calculation of the discount rate range of 9.0% to 11.0%; (ii) the range of terminal values; (iii) the inputs and assumptions for selecting perpetuity growth rates of -10.0% to 0.0%; (iv) the company specific inputs, including the Company's target capital structure weightings, the return on cash, future applicable marginal cash tax rate and a beta for the company, as well as certain financial metrics for the United States financial markets generally; (v) the illustrative enterprise and equity values; (vi) the assumptions behind the anticipated $375 million of cash proceeds; and (vii) the "additional information provided by Company management." *Id.* at 41-42.

36. Similarly, with respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose the following key components used in the analysis: (i) the terminal asset value of the Company; (ii) the inputs and assumptions behind applying a perpetual growth rate of negative 5%; (iii) the inputs and assumptions behind using a range of discount rates from 10.5% to 12.5 %; (iv) the estimated 2019 fiscal year-end excess cash, option exercise proceeds, total debt and the impact of certain net operating losses; and (v) the projected

unlevered free cash flows. *Id.* at 46.

37. These key inputs and assumptions are material to Med Co's stockholders, and their omission renders the summary of Goldman Sachs' *Illustrative Discounted Cash Flow Analysis* and J.P. Morgan's *Discounted Cash Flow Analysis* incomplete and misleading. This is particularly important where two different financial advisors inexplicably employed such differing inputs and assumptions. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow ("DCF") analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…* This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, Med Co stockholders cannot evaluate for themselves the reliability of the Discounted Cash Flow Analyses make a meaningful determination of whether the ranges reflect the true value of the Company or was the result of the Financial Advisor's unreasonable judgment, and make an informed decision regarding


whether to tender their shares in the Tender Offer.

38. With respect to Goldman Sachs' *Implied Premia Analysis*, the Recommendation Statement fails to disclose the range and individual price targets observed. *See* Recommendation Statement at 40. A fair summary of the *Implied Premia Analysis* requires the disclosure of the individual price targets for each estimate observed; merely providing the average that a banker calculated is insufficient, as stockholders are unable to assess whether the banker utilized reasonable price targets, or, instead, selected unreasonable price targets in order to make the Offer Price appear more favorable.

39. In sum, the omission of the above-referenced information renders the Recommendation Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Expiration Time, Plaintiff will be unable to make an informed decision concerning whether to tender his shares, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### Against All Defendants for Violation of Section 14(e) of the Exchange Act

40. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

41. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

42. Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation

Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer.  Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43. The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the Tender Offer and the intrinsic value of the Company.

44. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

45. The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares.  In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

46. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

47. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Time.

## COUNT II

### Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9

48. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49. Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

50. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

51. SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the

Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

52. In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

53. The omission of information from a recommendation statement will violate Section 14(d)(4) and Rule 14d-9(d) if other SEC regulations specifically require disclosure of the omitted information.

54. The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

55. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## COUNT III

### Against all Defendants for Violations of Section 20(a) of the Exchange Act

56. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57. The Individual Defendants acted as controlling persons of Med Co within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Med Co, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

58. Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Recommendation Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Tender Offer. They were thus directly involved in preparing the Recommendation Statement.

60. In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

61. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

62. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) and Rule 14d-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

63. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 12, 2019

**MONTEVERDE & ASSOCIATES PC**

By: */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building 350 Fifth Avenue, Suite 4405 New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*